# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **BEN E. KEITH, CO. d/b/a/** | § | |
| **BEN E. KEITH FOODS,** | § | |
| | § | |
| *Plaintiff/Counterclaim Defendant* | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:20-cv-00133-A** |
| | § | |
| **DINING ALLIANCE, LLC,** | § | |
| **BUYERS EDGE PLATFORM, LLC, and** | § | |
| **CONSOLIDATED CONCEPTS, LLC,** | § | |
| | § | |
| *Defendants/Counterclaim Plaintiffs* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **FOODBUY, LLC,** | § | |
| | § | |
| *Counterclaim Defendant/* | § | |
| *Counterclaim Plaintiff* | § | |

## DINING ALLIANCE, LLC AND BUYERS EDGE PLATFORM, LLC'S
## BRIEF IN SUPPORT OF THEIR OPPOSITION TO
## FOODBUY, LLC'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ........................................................................................................................ 3

A.    DA's GPO. ............................................................................................................... 3

B.    Foodbuy Processes Rebates for DA Until the Parties Separate in August
2018. ...................................................................................................................... 4

C.    DA Begins Processing Rebates Through Buyers Edge. ......................................... 6

D.    DA's Business Relationship with BEK. ................................................................. 7

E.    BEK Prepares to Unfairly Compete with DA through Unity Advantage
Group (UAG). ........................................................................................................ 7

F.    Foodbuy's Receipt of LOTs. .................................................................................. 9

G.    Foodbuy Engages in a Scheme to Hide LOTs from DA ...................................... 11

H.    First DA/BEK Litigation and Settlement. ............................................................ 14

I.    Using the Scheme Employed by Foodbuy to Hide LOTs From DA, BEK
is Able to Continue its Campaign To Steal DA Members in Willful
Disregard of the BEK Settlement. ....................................................................... 15

SUMMARY JUDGMENT STANDARD ................................................................................ 16

ARGUMENT ........................................................................................................................... 17

I.    Foodbuy Breached the Foodbuy Settlement Agreement ..................................... 17

    a.    North Carolina Law Applies to DA's Breach of Contract Claim
against Foodbuy. ...................................................................................... 17

    b.    Foodbuy Materially Breached the LOT Provision of the Foodbuy
Settlement. ............................................................................................... 18

    c.    The Damage Caused by Foodbuy's Material Breaches of the
Foodbuy Settlement Were Direct and Foreseeable. ................................ 21

    d.    DA Asserts Separate and Distinct Breach of Contract Claims
against Foodbuy and BEK. ...................................................................... 23

II.    Foodbuy Cannot Establish its Affirmative Defenses to DA's Breach of
Contract Claim As A Matter of Law. .................................................................. 23

III.    Foodbuy Tortiously Interfered With DA's And Buyers Edge's
        Membership Contracts and Business Relationships. ............................................. 26

        a.      Massachusetts Law Applies to Counterclaim Plaintiffs' Tortious
                Interference Claims. ................................................................................. 26

        b.      Foodbuy Tortiously Interfered with DA's and Buyers Edge's
                Contracts and Advantageous Relationships Under Massachusetts
                Law. ......................................................................................................... 28

                i.      Foodbuy Had Knowledge of DA's and Buyers Edge's
                        Contracts and Advantageous Relationships with DA's
                        Members. ..................................................................................... 29

                ii.     Foodbuy Intentionally Interfered with DA's and Buyer
                        Edge's Contracts and Advantageous Relationships by
                        Improper Means. .......................................................................... 30

        c.      In the Event the Court Applies Texas Law, Foodbuy is Still Not
                Entitled to Summary Judgment. ............................................................... 31

                i.      Foodbuy Willfully and Intentionally Interfered With the
                        Member Contracts and Relationships. ......................................... 32

                ii.     Foodbuy is Not Entitled to Summary Judgement on the
                        Claims for Tortious Interference with Continuing Business
                        Relationships. .............................................................................. 33

III.    Foodbuy is Not Entitled to Summary Judgment on DA's and Buyers
        Edge's Unfair Competition Claims. ...................................................................... 34

IV.     The Economic Loss Doctrine Does Not Apply. .................................................... 35

CONCLUSION ........................................................................................................................ 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*42 East, LLC v. D.R. Horton, Inc.*,
  722 S.E.2d 1 (N.C. App. 2012) .................................................................................................24

*American Nat'l Petroleum Co. v. Transcontinental Gas Pipe Line Corp.*,
  798 S.W.2d 274 (Tex. 1990) .............................................................................................35, 37

*Bailey v. Shell W. E&P, Inc.*,
  609 F.3d 710 (5th Cir. 2010) ...................................................................................................26

*Baty v. ProTech Insurance Agency*,
  63 S.W.3d 841 (Tex. App. 2001) ..............................................................................................32

*Belliveau v. Barco, Inc.*,
  987 F.3d 122 (5th Cir. 2021) ....................................................................................................16

*Ben E. Keith, Co. D/B/A Ben E/ Keith Foods v. Dining Alliance, Inc.*,
  CA 4:18-cv-00881-0 ................................................................................................................14

*Bicycle Transit Auth., Inc. v. Bell*,
  314 N.C. 219 (1985) .................................................................................................................18

*Canal Elec. Co. v. Westinghouse Elec. Co.*,
  973 F.2d 988 (1st Cir. 1992) ....................................................................................................36

*Cavicchi v. Koski*,
  67 Mass. App. Ct. 654 (2006) ...................................................................................................30

*CFJ Mfg., L.P. v. Sweetworks, Inc.*,
  No. 3:04-CV-0070-J-99TEM, 2005 WL 1027283 (M.D. Fla. Apr. 14, 2005) .........................36

*Charlotte Motor Speedway, Inc. v. Tindall Corp.*,
  672 S.E.2d 681 (N.C. App. 2009) .............................................................................................18

*Chris v. Epstein*,
  440 S.E.2d 581 (N.C. App. 1994) .............................................................................................21

*City of Beverly v. Bass River Golf Management, Inc.*,
  92 Mass. App. Ct. 595 (2018) ...................................................................................................31

*Combined Ins. Co. of Am. v. McDonald*,
  243 S.E.2d 817 (N.C. App. 1978) .......................................................................................18, 20

*Crescent University City Venture, LLC v. AP Atlantic, Inc.*,
2019 WL 3765313 (N.C. Super. August 8, 2019) ...................................................................23

*CS Technology, Inc. v. Horizon River Technologies, LLC*,
2020 WL 4546436 (W.D.N.C. 2020) .....................................................................................24

*D.C. v. Dallas Indep. Sch. Dist.*,
No. 3:17-CV-02981-E, 2020 WL 208819 (N.D. Tex. Jan. 14, 2020) ....................................17

*Dewan v. M-I, L.L.C.*,
858 F.3d 331 (5th Cir. 2017) ...........................................................................................23, 24

*Duncan v. Cessna Aircraft Co.*,
665 S.W.2d 414 (Tex. 1984).................................................................................................26

*El Paso Healthcare Sys., Ltd. v. Murphy*,
518 S.W.3d 412 (Tex. 2017)..................................................................................................27

*Exxon Corp. v. Emerald Oil & Gas Co., L.C.*,
348 S.W.3d 194 (Tex. 2011)..................................................................................................32

*Exxon Corp. v. Miesch*,
180 S.W.3d 299 (Tex. App. 2005).........................................................................................32

*Fafard Real Est. & Dev. Corp. v. Metro-Bos. Broad., Inc.*,
345 F. Supp. 2d 147 (D. Mass. 2004) .........................................................................27, 28, 30

*First Protective Insurance Company v. Rike*,
516 F.Supp.3d 513 (E.D.N.C. 2021)......................................................................................18

*Fontenot v. Upjohn Co.*,
780 F.2d 1190 (5th Cir. 1986) ...............................................................................................23

*Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*,
960 S.W.2d 41 (Tex. 1998)....................................................................................................35

*Francois v. Our Lady of the Lake Hosp., Inc.*,
8 F.4th 370 (5th Cir. 2021) ....................................................................................................16

*Global Hookah Distributors, Inc. v. Avior, Inc.*,
2020 WL 4349841 (W.D.N.C. July 29, 2020).......................................................................21

*Gutierrez v. Collins*,
583 S.W.2d 312 (Tex. 1979)..................................................................................................26

*Guzman v. Allstate Assurance Co.*,
No. 20-11247, 2021 WL 5228510 (5th Cir. Nov. 10, 2021) ..................................................17

*Heil Co. v. Polar Corp.*,
   191 S.W. 3d 805 (Tex. App. 2006)..........................................................................................35

*Heil-Quaker Corp. v. Mischer Corp.*,
   863 S.W.2d 210 (Tex. App. 1993)..............................................................................27, 32, 33

*Heinsohn v. Carabin & Shaw, P.C.*,
   832 F.3d 224 (5th Cir. 2016) ..................................................................................................17

*Hernandez v. US Bank, NA*,
   C.A. No. 3:13-cv-2164-0, 2013 WL 6840022 (N.D. Tex. Dec. 27, 2013)..............................35

*Houston v. Texas Dep't of Agric.*,
   No. 20-20591, 2021 WL 5147939 (5th Cir. Nov. 5, 2021) .....................................................16

*Inland Constr. Co. v. Cameron Park II, Ltd*
   640 S.E.2d 415 (N.C. Ct. App. 2007).....................................................................................25

*Inmar Brand Solutions, Inc. v. Infinity Sales Group, LLC*,
   2019 WL 5597894 (M.D.N.C. 2019).......................................................................................24

*Ion v. Chevron USA, Inc.*,
   731 F.3d 379 (5th Cir. 2013) ..................................................................................................16

*Janus Theatres of Burlington Inc. v. Aragon*,
   410 S.E.2d 218, 221 (N.C. App. 1991)...................................................................................21

*Jet Spray Cooler, Inc. v. Crampton*,
   385 N.E.2d 1349, 377 Mass. 159 (Mass. 1979)......................................................................37

*Kahn v. GBAK Properties, Inc.*,
   371 S.W.3d 347 (Tex. App. 2012)...........................................................................................32

*Kurker v. Hill*,
   44 Mass. App. Ct. 184 (1998).................................................................................................28

*Lamar Home, Inc. v. Mid Continent Cas. Co.*,
   242 S.W.3d 1 (Tex. 2007).......................................................................................................35

*Long v. Long*,
   588 S.E.2d 1 (N.C. App. 2003)...............................................................................................17

*Mary Kay, Inc. v. Weber*,
   601 F. Supp. 2d 839 (N.D. Tex. 2009) ..............................................................................27, 32

*Mitchell v. Lone Star Ammunition, Inc.*,
   913 F.2d 242 (5th Cir. 1990) ..................................................................................................26

*Moore v. Bushman*,
  559 S.W.3d 645 (Tex. App. 2018)..........................................................................................32

*Nall v. BNSF Ry. Co.*,
  917 F.3d 335 (5th Cir. 2019) ................................................................................................17

*National Controls Corp. v. National Semiconductor Corp.*,
  833 F.2d 491 (3d Cir. 1987)..................................................................................................23

*O'Brien v. Pearson*,
  449 Mass. 377 (2007) ............................................................................................................37

*Pipkin v. Thomas & Hill, Inc.*,
  236 S.E.2d 725 (N.C. App. 1977)..........................................................................................21

*Psy-Ed Corp. v. Klein*,
  459 Mass. 697 (2011) ..................................................................................................27, 28, 30

*Robinson v. Deutsche Bank Nat'l Tr. Co.*,
  No. 5:12-CV-590-F, 2013 WL 1452933 (E.D.N.C. Apr. 9, 2013)..........................................18

*Ryder v. Union Pac. R.R. Co.*,
  945 F.3d 194 (5th Cir. 2019) ................................................................................................17

*Sharyland Water Supply Corp. v. City of Alton*,
  354 S.W.3d 407 (Tex. 2011)..................................................................................................35

*Smith v. Reg'l Transit Auth.*,
  827 F.3d 412 (5th Cir. 2016) ................................................................................................24

*Staton Holdings, Inc. v. Russell Athletic, Inc.*,
  No. 3:09-CV-0419-D, 2009 WL 4016117 (N.D. Tex. Nov. 20, 2009) ...................................27

*Stemtech Int'l Inc. v. Drapeau*,
  No. 1:16-CV-918-RP, 2016 WL 7443181 (W.D. Tex. Dec. 27, 2016)..............................27, 31

*Supplee v. Miller-Motte Business College, Inc.*,
  768 S.E.2d 582 (N.C. App. 2015)..........................................................................................17

*Sw. Bell. Tel. Co. v. DeLanney*,
  809 S.W.2d 493 (Tex. 1991)..................................................................................................35

*Taylor Energy Co., L.L.C. v. Luttrell*,
  3 F.4th 172 (5th Cir. 2021) ..................................................................................................16

*Taylor-Travis v. Jackson State Univ.*,
  984 F.3d 1107 (5th Cir. 2021), cert. denied, No. 20-1715, 2021 WL 4507798
  (U.S. Oct. 4, 2021)................................................................................................................16

*Tigi Linea Corp. v. Professional Products Group, LLC*,
   2020 WL 7346721 (E.D. Tex. 2020) ........................................................................................26

*Tissue Transplant Technology, Ltd v. Osteotech, Inc.*,
   2005 WL 958407 (W.D. Tex. Apr. 26, 2005).........................................................................26

*U. S. for Use of F. E. Robinson Co. of N. C., Inc. v. Alpha-Continental*
   273 F. Supp. 758 (E.D.N.C. 1967)..........................................................................................25

*W.E. Garrison Grading Co. v. Piracci Constr. Co.*,
   221 S.E.2d 512 (N.C. Ct. App. 1975) .....................................................................................25

*Wal–Mart Stores, Inc. v. Sturges*,
   52 S.W.3d 711 (Tex. 2001)......................................................................................................33

*Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*,
   920 F.3d 958 (5th Cir. 2019) ..................................................................................................16

*Williams v. Carolina Power & Light Co.*,
   250 S.E.2d 255 (N.C., 1979)....................................................................................................22

## Other Authorities

Fed. R. Civ. P. 56(a) ....................................................................................................................16

Restatement of Contracts, §§ 274-275..........................................................................................18

Restatement (Second) of Conflict of Laws Section 145 (1988) ....................................................26

23 TEX. TECH L. REV. 477, 492 (1992) ......................................................................................36

## INTRODUCTION

Counterclaim Defendant, Foodbuy, LLC ("Foodbuy") seeks summary judgment on Counterclaim Plaintiffs Dining Alliance, LLC's ("DA") and Buyers Edge Platform, LLC's ("Buyers Edge") claims for Breach of Contract (Count II), Tortious Interference with Contractual/Advantageous Business Relationships (Count III), and Common Law Unfair Competition (Count IV). Foodbuy also seeks summary judgment on several of its affirmative defenses: waiver, modification, and the economic loss rule. In addition, Foodbuy purports to challenge DA's and Buyers Edge's damages for allegedly failing to segregate breach of contract damages between Foodbuy and Counterclaim Defendant, Ben E. Keith, Co. ("BEK").

In support of its motion, Foodbuy presents a distorted narrative of the issues and facts entirely disconnected from the evidence and the applicable legal standards and substantive law. Foodbuy's motion should be denied for the following reasons:

- The evidence demonstrates Foodbuy materially breached its contractual obligations to send DA copies of termination letters with a valid start date before invoicing manufacturers. Instead, Foodbuy buried terminations on a vast data sharing site DA stopped using following the end of the parties' business relationship.

  - DA's loss of members was a direct and foreseeable result of Foodbuy securing and billing on DA's members' purchase data without DA's knowledge.

  - Foodbuy has offered no evidence in support of its affirmative defenses of waiver and modification. To the contrary, DA immediately objected to Foodbuy's notifications and DA denies it agreed to any modification.

- Under Massachusetts law, which applies to DA's and Buyers Edge's tortious interference claims because Massachusetts has the most substantial relationship to the claims, the evidence supports DA and Buyers Edge had contracts and/or advantageous business relationships with DA's members with which Foodbuy intentionally interfered by improper means, including misrepresentations and deceptive business practices in disregard of known contractual obligations to DA.

- Even if Texas law applies to DA's and Buyers Edge's tortious interference claims, Foodbuy is not entitled to summary judgment because;

- o The evidence shows DA had valid and specific contracts with its members and Foodbuy willfully and intentionally interfered with and destroyed the value of the contracts. Buyers Edge owns DA and, therefore, owns the underlying member contracts.

- o The evidence also supports DA and Buyers Edge had continuing business relations with DA's members and Foodbuy intentionally interfered with the relations by independently tortious or unlawful acts, including misrepresentations.

- As Foodbuy is not entitled to summary judgment on the tortious interference claims, Foodbuy is not entitled to summary judgment on DA's and Buyers Edge's unfair competition claims.

- The economic loss rule does not apply to tortious interference claims nor where DA's tort claims are based on conduct independent of Foodbuy's breach of contract and the claims involve different measures of damages.

## BACKGROUND

DA and Buyers Edge both maintain a principal place of business in Waltham, Massachusetts.[1]  DA is a wholly owned subsidiary of Buyers Edge, which is the parent company of DA and other affiliated businesses.[2]

### A.  **DA's GPO.**

DA operates a group purchasing organization ("GPO"), which allows its members to purchase food, supplies, and inventory at a significant savings.[3]  DA obtains these savings by aggregating and leveraging its members' purchasing requirements to secure favorable pricing and rebates (or allowances) from hundreds of food manufacturers with whom DA and its partners contract to serve DA's members.[4]  Manufacturers offer these rebates and other marketing benefits to promote the sale of their products.[5]

In order to obtain rebates from manufacturers, DA and other GPOs across the country submit proof of customer purchases to manufacturers either directly or through third-party rebate processors.[6]  After DA's rebate processors invoice manufacturers using members' proof of purchase, the manufacturer issues a rebate payment to the rebate processor.[7]  The rebate processor then issues payment to DA, which, in turn, issues a check to the member for the member's portion of the rebate.[8]  The checks provided to DA's members are known as Manufacturer Appreciation Program (MAP) checks.[9]  DA generally issues MAP checks to its members on a quarterly basis in

---

[1] App. at 0102 (Affidavit of John Davie).
[2] *Id.*
[3] *Id.*
[4] App. at 0103 (Affidavit of John Davie).
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.*

the aggregate amount of all of their rebates from all manufacturers for the relevant quarter in which the purchases were made.[10]

Restaurants and food service operators apply to be members of DA by submitting a Letter of Participation ("LOP"), which, upon acceptance by DA and together with the Membership Terms and Conditions on DA's website, sets forth the terms of the members' participation in DA's GPO.[11] As set forth in DA's membership terms, each DA member remains part of DA's GPO until the member provides DA with written notice of termination, which becomes effective 90 days after receipt of notice by DA from the member.[12]  So long as a member remains part of DA's GPO, only DA is entitled to invoice manufacturers for rebates on members' purchases.  Members are prohibited from simultaneously being members of another GPO.[13]

B.    **Foodbuy Processes Rebates for DA Until the Parties Separate in August 2018.**

Starting in 2011, Foodbuy served as DA's third-party rebate processor whereby DA submitted members' proof of purchase records to Foodbuy and Foodbuy used the records to invoice manufacturers for rebates and deviated pricing.[14]  When Foodbuy served as DA's rebate processor, DA sent Foodbuy copies of LOPs executed by DA members to become part of DA's GPO, and Foodbuy was aware of the terms contained in the LOPs.[15]

Both Foodbuy and DA rely upon member purchase data to procure rebate revenue for themselves and their customers.  The allocation of purchase data is a zero-sum scenario because only one party is allowed to bill a manufacture for rebates on a purchase.  If a customer stops receiving rebates from its GPO, the customer's relationship with the GPO is immediately damaged.

---

[10] *Id.*
[11] *Id.;* Sealed Appx. at 0171-0176; Doc. 103 at App. 212-215.
[12] *Id.*
[13] *Id.*
[14] App. at 0104 (Affidavit of John Davie).
[15] SApp. at 261-262.  (Grobety Deposition at p. 123:5-16, 124:16-22).

If the customer begins receiving rebates from a different GPO, the customer's relationship with its prior GPO is effectively severed and likely permanently lost.

On August 21, 2018, DA and Foodbuy entered into a Confidential Settlement and Release Agreement (the "Foodbuy Settlement") to wind down their relationship.[16] A central aspect of the Foodbuy Settlement was identifying which party had the exclusive right to invoice on a particular member's or customer's purchase data and the consequences if a party billed on purchase data for which the other party had exclusive rights.[17]

Pursuant to Section 3(h) of the Foodbuy Settlement ("LOT Provision"), if Foodbuy obtained a letter of termination ("LOT") signed by a DA member purporting to terminate its membership in DA's GPO, Foodbuy was required to provide written notice to DA before invoicing on the customer's purchases:

> **Notice of Terminating Members Prior to Invoicing on Volume**.  In the event that either party obtains a Termination Letter signed by a member of the other party, each party agrees to send written notice to the other party with copies of the letters of termination signed by members and/customers, with a valid start date.  A copy of the written termination will be provided prior to any invoicing on the customers reported data so as to avoid double dipping manufacturers.  The Parties will use commercially reasonable efforts concerning members that they believe they have the right to invoice on.[18]

The LOT Provision was the subject of extensive discussions and negotiations between Foodbuy's and DA's legal counsel.[19]  The purpose of the LOT Provision was to create a transparent and efficient process by which each party could gain exclusive rights to, and bill on, the purchase data of a member who had terminated its relationship with the other party.  Accordingly, the LOT Provision avoided "double-dipping" manufacturers and also ensured that each side knew which

---

[16] Doc. 116 at App. 1-12.

[17] *Id.* See Section 3(a) (identifying which party was responsible if both parties billed on the same purchase data); and Section 3(d) (describing the transitioned of purchase data to Buyers Edge and Foodbuy's obligations if it received data which DA had the exclusive right to bill on).

[18] *Id.* at  App. 6, § (h).

[19] App. at 0113-0114 (Affidavit of J. Corrigan)

customers would be coming off their program and when.[20]  As Foodbuy understood at the time, Foodbuy's receipt of an LOT served a function beyond simply avoiding double-dipping – it also was a "validation of the intent of that customer to actually move from" one GPO to another.[21]

The LOT Provision contained three separate requirements.  First, if either party received an LOT from a member of the other party, the receiving party was required to (1) "send written notice to the other party"; (2) include a copy of the LOT; and (3) include a valid start date on which the receiving party intended to begin invoicing on the terminating member's purchase data.[22] Second, each party agreed that it would not invoice on a terminating member's purchase data until it had provided the other party with the aforementioned written notice.[23]  Third,  the parties agreed to "use commercially reasonable efforts" to determine and/or confirm they had a right to invoice on the other party's former member.[24]

These requirements ensured both parties were fully informed about any customer potentially transitioning from one party to the other.[25]  In addition, given DA required 90 days written notice from the member prior to termination, compliance with the LOT Provision allowed DA to verify the validity of LOTs and contact its member to determine whether the relationship could be recovered.

C.    **DA Begins Processing Rebates Through Buyers Edge.**

After DA severed its relationship from Foodbuy, DA began processing rebates on member purchases through Buyers Edge.[26]  Buyers Edge submitted some DA rebate claims through a third-

---

[20] *Id.* at 0114 (Affidavit of J. Corrigan).

[21] SApp. at 0266-27 (Grobety Deposition p. 157:22-158:18).

[22] Doc. 116 at App. 6, § (h).

[23] *Id.*

[24] *Id.*

[25] Appx. at 0114 (Affidavit of J. Corrigan).

[26] Appx. at 0104-05 (Affidavit of John Davie).

party rebate processing network.[27]   Buyers Edge also billed certain manufacturers directly for rebates pursuant to contracts Buyers Edge held with those manufacturers.[28]   Buyers Edge received revenue in exchange for these services.[29] Foodbuy knew that Buyers Edge was an affiliate of Dining Alliance and indeed viewed them as the same entity.[30]   As part of the Foodbuy Settlement, Foodbuy was also required to submit certain purchase data to Buyers Edge.[31]

D.   **DA's Business Relationship with BEK.**

For many years, DA was engaged in a business relationship with BEK, a distributor of food, beverages, and related products and services.[32]   In 2013, DA and BEK entered into a Purchase Agreement designed to allow DA and BEK to grow their respective businesses by promoting one another's offerings to their respective members and customers.[33]   Over the course of DA's relationship with BEK, thousands of customers that purchased products from BEK (representing approximately 5,000 foodservice locations) enrolled as members of DA.[34]   In January 2018, BEK provided notice to DA that BEK did not want to renew the Purchase Agreement in May 2018.[35]   However, in early May 2018, DA and BEK agreed to extend the term of the Purchase Agreement to August 31, 2018.[36]

E.   **BEK Prepares to Unfairly Compete with DA through Unity Advantage Group (UAG).**

During the extension of the Purchase Agreement, BEK requested and DA provided copies of LOPs and lists of rebate checks for thousands of BEK customers that had signed up as members

---

[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] App. at 192-193 (Knight Deposition at p. 57:17-58:10).
[31] Doc. 116 at App. 4-5 § (h).
[32] App. at 0105 (Affidavit of John Davie).
[33] *Id.*
[34] *Id.;* SApp. at 0075.
[35] App. at 0105 (Affidavit of John Davie).
[36] *Id.*

of DA.[37]  DA provided this confidential member information to BEK based upon the parties' ongoing business relationship which BEK suggested it sought to continue, and DA's understanding that BEK had requested the information in good faith.[38]

Unbeknownst to DA, BEK asked for the information to help BEK solicit DA's members to terminate their relationship with DA and join a new GPO, Unity Advantage Group, LLC ("UAG").  As explained below, the scheme between BEK and UAG also included Foodbuy.  In fact, unbeknownst to DA, BEK became a member of UAG in February 2018, months before extending the Purchase Agreement with DA.[39]  As a member of UAG, BEK receives a share of the rebate revenue generated through the UAG program.[40]  On August 20, 2018, UAG and Foodbuy entered into a group purchasing services agreement by which UAG customers could participate in Foodbuy's rebate processing program.[41]  UAG officially launched on September 1, 2018.[42]

Foodbuy worked with UAG to create and maintain an "LOT tracker."[43] The LOT tracker specifically tracked BEK customers whom Foodbuy, BEK, and UAG sought to convert from DA to UAG.[44]  In September 2018, Foodbuy received notice that UAG was seeking to convert over 1,200 BEK customer locations which were currently DA members.[45]  UAG would eventually seek to convert thousands of BEK customer locations which were currently DA members.[46]

---

[37] *Id.*
[38] *Id.*
[39] SApp. at 020 (Thornburg Ex. 18).
[40] *Id.* at 001 (Thornburg Ex. 4); at 292-296  (Thornburg Deposition at p. 78-80, 82-83).
[41] *Id.* at 183 (UAG Ex. 4).
[42] *Id.* at 022 (Thornburg Ex. 21).
[43] *Id*. at 24-64 (excel sheet has certain columns hidden to allow for production in PDF format).
[44] *Id*.
[45] *Id*.
[46] *Id*.

On August 28, 2018, BEK abruptly delivered a termination letter to DA stating BEK had elected not to continue the relationship and, pursuant to the parties' agreement, the Purchase Agreement would terminate effective August 31, 2018.[47]  At the same time, BEK advised DA that, as of September 1, 2018, BEK would (a) stop reporting to DA on DA's members' purchases from BEK and (b) seek to move DA's members that purchase through BEK to UAG.[48]  On September 1, 2018, BEK shut off all purchase data flowing to DA and, as detailed below, launched an unfair and deceptive campaign to force DA members to terminate DA and join UAG.[49]

F.   **Foodbuy's Receipt of LOTs**

Initially, UAG and BEK began collecting LOPs from DA members they sought to convert to UAG.  The LOPs contained statements that the customer had terminated its relationship with any prior GPO.[50]  However, after receiving only LOPs, Foodbuy informed UAG it would also need to collect LOTs for all of the locations UAG was converting from DA.[51] UAG pushed back on this requirement.[52]  Consequently, Foodbuy knew substantial amounts of LOPs had been collected without requiring the converted DA member to execute and transmit a LOT.

BEK, UAG, and Foodbuy then worked together to develop a specific process for enrolling DA members in UAG and off-boarding them from DA.[53]  Foodbuy required LOTs for all customers moving from DA to UAG.[54]  As part of the agreed procedure, BEK obtained LOTs and provided them to UAG, UAG provided them to Foodbuy, and Foodbuy posted the LOTs on a

---

[47] App. at 0106 (Affidavit of John Davie).
[48] *Id.*
[49] *Id.*
[50] App. at 064.
[51] App. at 195-201 (Mosely Deposition pp. 26-27, 107-08, 110-111).
[52] App at 233-235 (Stokas Deposition II pp. 187:17-189:10); SApp. at 256.
[53] SApp. at 0004 (Thornburg Ex. 4); 0007 (Thornburg Ex. 10); 0254.
[54] App. at 195-201 (Mosely Deposition pp. 26-27, 107-08, 110-111).

Foodbuy FTP site.[55]  Members were not required to send LOTs to DA.[56]  UAG tracked the LOTs in a spreadsheet updated and circulated to BEK weekly with input from Foodbuy.[57]  In the tracker, Foodbuy provided the date it received the LOT from UAG, the date Foodbuy purportedly "sent" the LOT to DA (by posting it to an FTP site), and an "agreed transition date."[58]  There was a 90 day waiting period between the date Foodbuy "sent" the LOT to DA and the "agreed transition date."[59]  On the "agreed transition date", the customer's enrollment in UAG was deemed effective, BEK began reporting purchase data to UAG, and UAG and Foodbuy began billing manufacturers on the customer's purchases.[60]

Foodbuy was aware that when UAG, through BEK sales representatives, collected LOTs, the converting DA members were not independently transmitting the LOTs to DA.[61]  On multiple occasions starting after UAG launched on September 1, 2018, DA's counsel notified Foodbuy's counsel that UAG and BEK were improperly obtaining LOTs through misrepresentation, coercion, and/or forgery.[62]  On September 10, 2018, DA' s counsel forwarded Foodbuy's counsel an email DA's counsel sent to BEK's counsel.  DA's counsel described BEK's unfair and deceptive conduct that was interfering with DA's member relationships and causing members to breach their obligations by not providing DA directly with 90 days advance written notice before termination is effective.[63]  Despite this and many other similar communications over the next several month,

---

[55] SApp. at 0298-99 (Thornburg Deposition II p. 127-128); App. at 20 (Thornburg Ex. 38); 202-204 (Mosley Deposition pp. 123, 125-126).
[56] SApp. at 0004 (Thornburg Ex. 5); 254.
[57] App. at 249-250 (Thornburg Deposition II pp. 134-135); 0205-207 (Mosely Deposition 137-39); SApp. 277 (Mosely Deposition p. 159).
[58] SApp. at 274-276 (Mosely Deposition p. 156-158); App. at 201-211 (Mosely Deposition p. 236-37).
[59] SApp. at 276 (Mosely Deposition p. 158).
[60] SApp. at 278 (Mosely Deposition p. 160); App. at 201 (Mosely Deposition p. 236).
[61] SApp. at 262 (Grobety Deposition p. 151:16-23).
[62] App. at 0115 (Affidavit of J. Corrigan).
[63] *Id.*

Foodbuy never took any steps to investigate the validity of the LOTs it received from UAG and BEK or whether DA was receiving LOTs from its members.[64]

In some instances multiple DA member locations are owned and operating by the same parent company.[65]  In other instances, multiple DA member locations may have some past or present affiliation, or similar name, but otherwise operate as independent legal entities.  In some instances a parent company executed an LOT specifically listing all affiliates to which the LOT applied.[66]  Foodbuy then applied that LOT to all of the listed affiliates.[67]  Foodbuy also frequently applied an LOT which listed only one entity to other entities who Foodbuy assumed shared common ownership.[68]  There is no evidence that Foodbuy ever contacted the entities not listed on the LOT, to ensure that they also intended to terminate their relationships with DA. Foodbuy admitted it never informed DA it was applying LOTs in this manner.[69] Foodbuy also admitted DA would have no way of knowing Foodbuy was engaging in this practice.[70]

      G.      **Foodbuy Engages in a Scheme to Hide LOTs from DA**

Foodbuy first began receiving LOTs from UAG around October 22, 2018.[71]  Foodbuy initially believed that, pursuant to the LOT Provision, it was required to provide actual copies of the LOTs to DA.[72]  Accordingly, when on October 24, 2018, a Foodbuy employee named Nate Ensor emailed DA its first correspondence regarding LOTs, he included copies of the LOTs.[73]

---

[64] App. at 116 (Affidavit of J. Corrigan); 194 (Knight Deposition p. 164:3-11).
[65] App at 229-232 (Stokas Deposition II p. 163-166).
[66] *Id*.
[67] *Id.*
[68] SApp. at 0024; 0240-249 (Applying LOTs for Jakes to eight different Jakes locations; Applying LOT for Grazia Italian Kitchen to multiple locations; Applying LOT for Laynes of College Station to Laynes Greens Prairie and Layne's - Wellborn Rd).
[69] App. at 222 (Stokas Deposition I p. 178).
[70] App at 229-232 (Stokas Deposition II p. 163-166).
[71] App. at 0024
[72] App. at 179-180 (Grobety Deposition p. 83:12-84:10).
[73] App. at 131-133.

That email also contained a list of the 13 locations and attached each location's LOT.[74] However, the email did not identify a valid start date for any of the customers.[75]  Rather, the email requested DA respond within seven business days if a termination notice time frame existed.[76]

DA's counsel wrote to Foodbuy's counsel objecting to the notice and the failure to honor DA's membership terms and conditions requiring 90 days advance notice.[77]  DA's counsel also noted he was reviewing the LOTs to see if they were signed by the customer.[78] DA's and Foodbuy's counsel exchanged many similar communications over the fourth quarter of 2018 as the DA/Foodbuy wind down period came to an end on December 31, 2018 and Mr. Ensor continued to email DA regarding LOTs without acknowledging DA's membership terms.[79] Foodbuy's counsel promised Foodbuy would follow the 90 day notice permit and submit LOTs to DA per the terms of the Foodbuy Settlement.[80]  Foodbuy understood DA wanted to ensure the 90 day notice period so that DA would have the opportunity to talk with its customers about whether or not the customer wanted to stay with DA and win back any business it might be losing to a competing GPO.[81]  Despite committing to following the 90 day notice period,  Foodbuy did not do so.

In addition to failing to adhere to its promises regarding the 90 day  notice provision, Foodbuy also engaged in a process to hide the LOTs from DA.  Mr. Ensor's emails generally started with the phrase "As to our agreed-to process."[82]  This phrase referred to the requirements

---

[74] *Id.*
[75] *Id.*
[76] *Id.*
[77] App. at 117-18 (Affidavit of J. Corrigan).
[78] *Id.*
[79] App. at 119-123 (Affidavit of J. Corrigan).
[80] *Id*. at 123-124 (Affidavit of J. Corrigan).
[81] App. at 190-191 (Knight Deposition p. 37-38).
[82] Doc 116 at App. 73-75.

in the LOT Provision, and did not encompass any other agreement.[83]  However, with the exception of the October 24, 2018 email, Foodbuy never attached any copies of the LOTs to its emails and, even stopped including a list of the members or any information about the LOTs it claimed to have received.[84]  Rather, at the bottom of Mr. Ensor's emails in the fourth quarter of 2018, Mr. Ensor stated LOTs were also posted on the "FTP" in a folder.[85]  The LOT Provision did not allow for positing on the FTP site as a valid method of notification. The FTP was a site hosted and maintained by Foodbuy. [86] The FTP site had been previously used by DA and Foodbuy for sharing substantial amounts of confidential financial data when Foodbuy and DA worked together. [87]  Prior to October 2018, Foodbuy never posted LOTs it received to the FTP site.[88]  After the wind down at the end of 2018, DA had no reason to ever access the FTP site.  Indeed DA did not want its employee accessing Foodbuy's confidential and financial information, or vice versa, as DA was doing business with Foodbuy's competitor.[89]

Continuing into 2019, Foodbuy again changed its emails regarding LOTs and none of the emails included copies of LOTs, the number of LOTs, the identity of the members, or a valid start date.[90]  Further, Foodbuy did not know, nor could it even determine, whether DA ever accessed the FTP site.[91]  At no point in time did Foodbuy advise DA it intended to stop sending DA copies of LOTs and instead post them to an FTP as the sole means for providing DA with notice.[92]  Conversely, each time DA notified Foodbuy it had received LOTs for Foodbuy members, DA

---

[83] App. at 166-168 (Grobety Deposition pp. 46-47, 57).
[84] Doc 116 at App. 29-75
[85] *Id.*
[86] App. at 172-173 (Grobety Deposition p. 69-70).
[87] App. at 120-121 (Affidavit of J. Corrigan).
[88] App. at 178 (Grobety Deposition p. 119).
[89] *Id.*
[90] Doc 116 at App. 29-75.
[91] App. at 174-175 (Grobety Deposition p. 72-73).
[92] App. at 122 (Affidavit of J. Corrigan).

emailed Foodbuy with a copy of the LOTs attached and never posted LOTs to Foodbuy's FTP site[93].

DA did not access the FTP site in 2019, until late in the year, when it first learned Foodbuy had purportedly posted thousands of LOTs. By then Foodbuy's scheme of burying the LOTs out of DA's sight caused DA to forever loose thousands of DA members.

H.   **First DA/BEK Litigation and Settlement.**

In the fall of 2018, BEK sued DA in this Court (*Ben E. Keith, Co. D/B/A Ben E/ Keith Foods v. Dining Alliance, Inc.*, CA 4:18-cv-00881-0). The case settled in April 2019, just after DA filed a motion to join Foodbuy and UAG.[94] In the settlement agreement between DA and BEK dated April 4, 2019 (the "BEK Settlement"), BEK agreed to provide ongoing proof of purchase reporting directly to DA.[95] This was DA's primary incentive to enter into the agreement.[96] Because of BEK's widespread forgeries of LOTs in the first action and because BEK sales representatives had been emailing purported LOTs to DA's CEO, DA required BEK to continue to provide reporting unless a member terminated their membership in DA in accordance with DA's membership terms and conditions.[97] Therefore, the BEK Settlement provided that if a DA member executed and sent a valid LOT directly to DA, BEK was permitted to stop reporting with regard to the member 90 days after DA received the LOT from the member.[98]

---

[93] SApp. at 267 (Grobety Deposition pp. 158).
[94] App. 68-101.
[95] Doc 108, App. 11, ¶ 5.
[96] App. 106-07 (Affidavit of J. Davie).
[97] *Id.*
[98] Doc. 108, App. 11, ¶ 5.

**I.      Using the Scheme Employed by Foodbuy to Hide LOTs From DA, BEK is Able to Continue its Campaign To Steal DA Members in Willful Disregard of the BEK Settlement.**

Immediately after securing releases (for itself, Foodbuy, and UAG) in the BEK Settlement, BEK began breaching its settlement agreement with DA and engaging in the very same conduct for which DA counterclaimed against BEK in the first lawsuit.  Based upon Foodbuy's non-compliant and deceitful emails with DA regarding the alleged provision of LOTs to DA, and with no regard for whether members had sent an LOT to DA, BEK stopped reporting proof of purchases to DA for thousands of members who had not served DA with a valid LOT in breach of BEK's obligations under the BEK Settlement.[99]  Instead, BEK switched the data feed to UAG and Foodbuy enabling UAG and Foodbuy to invoice manufacturers and process rebates on DA's members' purchases, thereby taking for themselves rebate revenue rightfully belonging to DA and Buyers Edge.[100]

Notwithstanding BEK's purported agreement to honor DA's membership terms requiring members to send LOTs to DA, BEK made no change to the LOT tracking process in any manner after the BEK Settlement.[101]  BEK did not begin tracking whether customers sent LOTs to DA, nor did BEK require customers to do so.[102]  BEK continued doing exactly what it had been doing and it stopped reporting purchase history to DA 90 days after Foodbuy confirmed receipt of LOTs on the "agreed transition date."[103]

In the months following DA's discovery of BEK's and Foodbuy's wrongful conduct, DA began calling its members in an effort to validate whether members had knowledge of and

---

[99] App. 108 (Affidavit of J. Davie); App. 279-85; App. 10-19.
[100] App. 280-87; App. 7
[101] App. 208-09.
[102] SApp. 280-90; SApp. 16
[103] App. 244-45; SApp. 285-86; App. 7; App. 108 (Affidavit of J. Davie)

consented to the purported terminations.[104]  DA discovered that approximately 71 of the LOTs on the Foodbuy FTP site were forged and/or improperly executed by BEK personnel without the knowledge or consent of DA's members.[105]

## SUMMARY JUDGMENT STANDARD

Summary judgment is only appropriate if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Taylor Energy Co., L.L.C. v. Luttrell*, 3 F.4th 172, 175 (5th Cir. 2021); *Francois v. Our Lady of the Lake Hosp., Inc.*, 8 F.4th 370, 376 (5th Cir. 2021). A genuine issue of material fact exists when, "after considering the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, a court determines that the evidence is such that a reasonable jury could return a verdict for the party opposing the motion." *Houston v. Texas Dep't of Agric.*, No. 20-20591, 2021 WL 5147939, at \*3 (5th Cir. Nov. 5, 2021) (quoting *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 389 (5th Cir. 2013)). *See also Francois v. Our Lady of the Lake Hosp., Inc.*, 8 F.4th 370, 376 (5th Cir. 2021) ("A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

In evaluating a motion for summary judgment, the courts view all facts and reasonable inferences drawn from the record "in the light most favorable to the party opposing the motion." *Belliveau v. Barco, Inc.*, 987 F.3d 122, 128 (5th Cir. 2021) (quoting *Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019)). The Fifth Circuit has instructed that a court, in determining the merits of a motion for summary judgment, "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Taylor-Travis v. Jackson State Univ.*, 984 F.3d 1107, 1112 (5th Cir. 2021), cert. denied, No. 20-1715, 2021 WL 4507798

---

[104] App. 109 (Affidavit of J. Davie)

[105] *Id.; App. 32-63.*

- 16 -

(U.S. Oct. 4, 2021); *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 (5th Cir. 2019); *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 245 (5th Cir. 2016). Further, the court must "refrain from making credibility determinations or weighing the evidence." *Ryder v. Union Pac. R.R. Co.*, 945 F.3d 194, 199 (5th Cir. 2019). If there is any genuine dispute of material fact that a trier of fact may reasonably resolve in favor of either party, then a motion for summary judgment must be denied. *Id.; Guzman v. Allstate Assurance Co.*, No. 20-11247, 2021 WL 5228510, at \*2 (5th Cir. Nov. 10, 2021) ("The sole question is whether a 'reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor.'"); *D.C. v. Dallas Indep. Sch. Dist.*, No. 3:17-CV-02981-E, 2020 WL 208819, at \*2 (N.D. Tex. Jan. 14, 2020) ("A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor.").

## ARGUMENT

### I.   Foodbuy Breached the Foodbuy Settlement Agreement

#### a.   North Carolina Law Applies to DA's Breach of Contract Claim against Foodbuy.

The Foodbuy Settlement contains a North Carolina choice of law provision.  Under North Carolina law, the "elements of breach of contract are (1) the existence of a valid contract and (2) breach of the terms of the contract." *Long v. Long*, 588 S.E.2d 1, 4 (N.C. App. 2003).  To be actionable, there "must be a material breach, one that substantially defeats the purpose of the agreement or goes to the very heart of the agreement, or can be characterized as a substantial failure to perform." *Id.*  North Carolina courts typically view the materiality of breach as a question of fact properly determined by the fact finder, whether jury or judge. *See e.g. Supplee v. Miller-Motte Business College, Inc*., 768 S.E.2d 582, 593 (N.C. App. 2015) ("[t]he question of whether a breach

of contract is material is ordinarily a question for a jury") (quoting *Charlotte Motor Speedway, Inc. v. Tindall Corp.*, 672 S.E.2d 681, 695 (N.C. App. 2009)); *Combined Ins. Co. of Am. v. McDonald*, 243 S.E.2d 817, 820 (N.C. App. 1978) ("[w]hether a failure to perform a contractual obligation is so material as to discharge other parties to the contract from further performance of their obligations thereunder is a question of fact which must be determined by the jury or, in appropriate cases such as this case, by the trial court without jury" (citing Restatement of Contracts, §§ 274-275)).

Additionally, every North Carolina contract contains "an implied covenant of good faith and fair dealing." *First Protective Insurance Company v. Rike*, 516 F.Supp.3d 513, 531 (E.D.N.C. 2021) (quoting *Bicycle Transit Auth., Inc. v. Bell*, 314 N.C. 219, 228 (1985)). Under the covenant, "neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Id.* (quoting *Robinson v. Deutsche Bank Nat'l Tr. Co.*, No. 5:12-CV-590-F, 2013 WL 1452933, at *11 (E.D.N.C. Apr. 9, 2013) (unpublished)). "[B]reach of the covenant of good faith and fair dealing is part and parcel of a claim for breach of contract." *Id.* (citations and quotations omitted).

### b.   Foodbuy Materially Breached the LOT Provision of the Foodbuy Settlement.

Ignoring the parties extensive pre-settlement communications on the subject, the obvious substantial economic reasons for the provision, and the clear explicit terms of the Foodbuy Settlement, Foodbuy asks this Court to treat the LOT Provision as simply an inconsequential notice provision with no purpose other than to prevent double-dipping. Foodbuy asserts that because the LOT Provision did not specify the precise manner by which LOTs must be sent, Foodbuy was free to use any method it wanted even if Foodbuy ignored the precise terms of the LOT Provision and did not: (1) actually send DA a copy of the LOT; (2) identify the associated customer(s); or (3) provide a valid start date for the transfer of purchase data and invoicing. The factual record shows

otherwise and shows Foodbuy intentionally buried the LOTs in a vast data sharing site not used since following the end of Foodbuy and DA's business relationship. Foodbuy has admitted it believed it was required to email copies of LOTs to DA and identify in the email all of the members who had provided LOTs and, in fact, did so in its first correspondence with DA on the subject. See App. at 179-180 (Grobety Deposition p. 83:12-84:10). Likewise, DA always emailed Foodbuy copies of LOTs. App. at 267 (Grobety Deposition pp. 158). There was never any modification to the LOT provision by which DA agreed to receive copies of LOTs solely via an FTP site, and Foodbuy cites to no evidence of such agreement. App. 161-62. DA ceased using the FTP site when the parties ended their business relationship and the wind down period concluded in December 2019, and DA believed it was improper to access the FTP site of a competitor where confidential information was stored. Accordingly, after the wind-down period, DA did not access the FTP site until the end of 2019 when it first learned Foodbuy had posted thousands of LOTs and had likely been billing on DA's members' purchase data without DA's knowledge. This is exactly what Foodbuy hoped would happen when it sought to bury the LOTs on the FTP site.

Further, Foodbuy applied LOTs to multiple locations without any notice to DA as a clever part of its scheme to hide LOTs from DA, a fact which Foodbuy conveniently ignores in its motion. Foodbuy also breached the LOT Provision by failing to use commercially reasonable efforts to determine and/or confirm it had a right to invoice on the purchase data of allegedly terminating members. In an act of willful blindness, Foodbuy claims it relied on provisions in UAG's LOPs to ensure DA member LOTs were being validly obtained, executed, and independently provided to DA when, in fact, Foodbuy orchestrated the entire LOT process without requiring anyone other than Foodbuy to send LOTs to DA.

Foodbuy ignored its explicit and precise obligations under the LOT Provision and undermined the provision's central purpose of providing a mutually agreed upon, transparent, and efficient process for one party to gain exclusive rights and bill on the purchase data of members that had properly terminated their relationship with the other party.  There is more than sufficient evidence Foodbuy intentionally and materially breached the LOT provision in the Foodbuy Settlement.

Moreover, Foodbuy's argument that North Carolina courts have routinely found breaches of notice provisions to be immaterial as a matter of law is not supported by the cited cases.  In *McDonald*, the Court of Appeals for North Carolina weighed the materiality of a restrictive covenant and a ten-day notice of termination clause in an employment contract *post-trial*,[106] making factual findings regarding the perceived significance of the clauses at issue in the dispute. *See* 243 S.E.2d at 182.  After finding the restrictive covenant clause was "especially of essence," while the notice provision was not, the court concluded "the clear intent of the parties to the contract" demonstrated that the restrictive covenants, but not the notice of termination provision, were material terms to the contract.  *Id.* at 184.  Rather than summarily deciding on summary judgment that a notice provision was immaterial as a matter of law, the *McDonald* court assessed the evidence post-trial, examining the contracting parties' intentions in entering into the various contractual provisions, including the notice provision.

Similarly, in *Sanderford*, the court held that a party's breach of a notice provision by two days was not a material breach where the parties' conduct demonstrated substantial performance under the contract and there was no evidence in the record that the specific day of performance

---

[106] Foodbuy erroneously claims in a parenthetical that *McDonald* was decided at summary judgment.  That is incorrect – *McDonald* was decided following a bench trial.  *See* 243 S.E.2d at 818.

was significant to either party.  531 Fed. Appx. 358, 362-3 (4th Cir. 2013).  Finally, in *Janus Theatres of Burlington Inc. v. Aragon*, the Court of Appeals of North Carolina concluded (reversing the trial court) that a notice provision likely *was* material to the parties' contract, and thus plaintiff's failure to comply with that provision likely constituted a material breach.  *See* 410 S.E.2d 218, 221 (N.C. App. 1991).

Taken together, these cases stand for a very different proposition than that argued by Foodbuy. Far from a blanket rule of immateriality, North Carolina law requires breach of notice provisions to be analyzed under the materiality framework and factual determinations must be made regarding the intent and significance of the provision in the context of the parties' relationship.  This is precisely the type of analysis that should not be made in deciding a motion for summary judgment.  Even if Foodbuy allegedly viewed the LOT Provision as inconsequential (which the evidence does not support), there is a genuine dispute as to the purpose and materiality of the LOT Provision.

### c. The Damage Caused by Foodbuy's Material Breaches of the Foodbuy Settlement Were Direct and Foreseeable.

Where a breach of contract has been established, the injured party "may recover all of the damages which were foreseeable at the time of the contract as a probable result of the breach either because they were a natural result or because they were a contemplated result of the breach." *Chris v. Epstein*, 440 S.E.2d 581, 584 (N.C. App. 1994) (quoting *Pipkin v. Thomas & Hill, Inc.*, 236 S.E.2d 725, 731 (N.C. App. 1977)).  A party may also recover special or consequential damages, such as lost profits caused by lost business, by demonstrating "it has suffered damages such as may reasonably be supposed to have been within the contemplation of the parties when the contract was made." *Global Hookah Distributors, Inc. v. Avior, Inc.*, 2020 WL 4349841, at *10 (W.D.N.C. July 29, 2020).  "[I]t is only in exceptional cases, in which reasonable minds cannot differ as to

foreseeability of injury, that a court should decide proximate cause as a matter of law," *Williams v. Carolina Power & Light Co.*, 250 S.E.2d 255, 258 (N.C., 1979)

Purchase data is the lifeblood of the GPO and rebate processing industry.  Anything that compromises a GPO's ability to secure its members purchase data inevitably results in lost rebate revenue, a disruption in the GPO member relationship, and permanent loss of members.  As discussed above, the LOT Provision, like other provisions in the Foodbuy Settlement, was meant, in part, to prevent one party from infringing the other party's exclusive right to bill on its members' purchase data.  Indeed, Section 3(a) addressed unintentional disruptions that might occur during the wind-down period when DA was transitioning to a different rebate processor.  Doc. 116 at App. 1-12.  It required DA to reimburse Foodbuy for losses caused by DA billing on purchase volume that only Foodbuy was entitled to invoice.  *Id.* Likewise, Foodbuy was required to send DA purchase data it inadvertently received. *Id.*  Given the parties expressly contemplated harm resulting from unintentional actions, there is no question the parties contemplated damages would result from breach of material terms concerning the exclusive right to bill on purchase data.

Here, Foodbuy's billing on and profiting from DA's members' purchase data without compliance with the LOT Provision directly and foreseeably damaged DA as DA could no longer bill on the data and DA did not know Foodbuy was doing so.  Foodbuy's breach of the LOT Provision resulted in the permanent loss of DA members and the associated profits DA should have received from members.  This form of loss was reasonably foreseeable by Foodbuy, which understood the natural and probable consequences of one party billing on the other's purchase data without the other's knowledge.

**d.      DA Asserts Separate and Distinct Breach of Contract Claims against Foodbuy and BEK.**

Foodbuy wrongly asserts that DA is seeking to impose joint and several liability against Foodbuy and BEK for both parties' breach of their respective agreements with DA.  In fact, DA has asserted distinct breach of contract claims against both entities.  DA's breach of contract claim against BEK is based on BEK's failure to report purchase data to DA for member purchases in calendar year 2019.  Conversely, DA claims Foodbuy's breach of contract caused the permanent loss of members.  DA's claims are therefore materially different than those asserted in *Crescent University City Venture, LLC v. AP Atlantic, Inc.*, 2019 WL 3765313 (N.C. Super. August 8, 2019) where  the plaintiff sought joint and several liability against three sub-contractors for the totality of damages caused by the individual breaches of their respective sub-contracts.  *Id.*, at *23.

Foodbuy's reliance *National Controls Corp. v. National Semiconductor Corp.*, 833 F.2d 491, 496 (3d Cir. 1987) is also misplaced.  First, *National Controls Corp.* dealt with a breach of contract case decided on Pennsylvania law.  Second, the case addressed the plaintiff's failure, at trial, to establish proximate causation for its damages claim against the defendant.  *Id.*  The fact that DA, in separate claims, is seeking similar damages against BEK and Foodbuy for losses in 2019 does not mean that, as a matter of law, DA cannot establish a triable fact as to whether Foodbuy's breach of the Foodbuy Settlement proximately caused DA's damages.

**II.      Foodbuy Cannot Establish its Affirmative Defenses to DA's Breach of Contract Claim As A Matter of Law.**

Foodbuy seeks summary judgment on its affirmative defenses of waiver and modification.  "When summary judgment is sought on an affirmative defense, as here, the movant 'must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor.'"  *Dewan v. M-I, L.L.C.*, 858 F.3d 331, 334 (5th Cir. 2017), quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  "Once the movant does so, the burden shifts to the

nonmovant to establish an issue of fact that warrants trial. *Id.*, quoting *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 420 n.4 (5th Cir. 2016)."

Whether a parties "conduct amounted to waiver is, [] a question of fact to be decided by the trial court." *42 East, LLC v. D.R. Horton, Inc.*, 722 S.E.2d 1, 7 (N.C. App. 2012). Likewise, where there is a dispute as to whether the parties agreed to modify a contract, disputed "issues of fact make summary judgment inappropriate" *Inmar Brand Solutions, Inc. v. Infinity Sales Group, LLC*, 2019 WL 5597894, at \*5 (M.D.N.C. 2019); *CS Technology, Inc. v. Horizon River Technologies, LLC*, 2020 WL 4546436, at \*6 (W.D.N.C. 2020) ("As with the issue of whether the parties' subsequent conduct amounted to a waiver, whether the parties' subsequent conduct amounted to a modification is generally a question of fact for the jury.").

Foodbuy concedes it believed the LOT Provision required it to directly send DA actual copies of the LOTs it received (i.e. as email attachments). App. at 179-180 (Grobety Deposition p. 83:12-84:10). Foodbuy does not cite to any evidence the parties ever agreed to change the LOT Provision. Although Foodbuy argues otherwise, its employees conceded that the language in Foodbuy's notification emails ("[a]s per our agreed-to-process") referred to the process delineated in the Foodbuy Settlement and not to any modification of the LOT Provision. App. at 166-168 (Grobety Deposition pp. 46-47, 57).

In support of its defenses, Foodbuy argues that an implicit modification or waiver arose due to DA's alleged failure to object to Foodbuy's LOT notification emails. Foodbuy ignores that DA immediately objected that the notifications were not in conformance with the LOT Provision and DA's counsel had multiple emails and phone calls with Foodbuy's counsel emphasizing the importance of adhering to the terms of the LOT Provision and honoring DA's 90 day notice period, with which Foodbuy's counsel agreed to comply. Further, contrary to an alleged agreed

modification, Foodbuy concedes that DA always emailed Foodbuy with a copy of the LOTs DA received attached to the email and never posted them on the FTP site.

Foodbuy's argument that using an FTP site was simply more convenient is undermined by the facts. First, Foodbuy never told DA it was switching to FTP postings as the sole method of sending LOTs to DA. Second, the FTP method did not identify the LOTs, the member locations, or the corresponding start dates, intentionally making it more difficult for DA to get the information for which it negotiated in the LOT Provision. Third, the FTP process left DA vulnerable to claims it was accessing Foodbuy's confidential information. Lastly, Foodbuy employees conceded that the effort to attach LOTs to an email, as opposed to uploading to an FTP site, would have been the same. App. at 177-178 (Grobety Depo 77:18-78:9).

Foodbuy's reliance on construction cases is misplaced and misleading. These cases all dealt with situations where the parties undisputedly made an oral agreement to have a contractor perform additional work, and the contractor performed such additional work, to the benefit of the defendant, without objection. *W.E. Garrison Grading Co. v. Piracci Constr. Co* 221 S.E.2d 512, 515 (N.C. Ct. App. 1975); *Inland Constr. Co. v. Cameron Park II, Ltd* 640 S.E.2d 415, 418 (N.C. Ct. App. 2007); *U. S. for Use of F. E. Robinson Co. of N. C., Inc. v. Alpha-Continental* 273 F. Supp. 758, 778 (E.D.N.C. 1967). Here, not only does DA deny there was a modification or waiver, Foodbuy cites no evidence to support either occurred. App. 161-62.

Here, there is a dispute as to whether the parties agreed to modify the LOT Provision. There is substantial evidence DA objected to the manner in which Foodbuy was failing to comply with the LOT Provision. There is no evidence DA ever acted in accordance with any alleged modification, nor is there any evidence that DA would have benefited from such modification. Moreover, Foodbuy does not even argue the existence of any waiver or modification which would

excuse its failure to notify DA that it was applying LOTs to multiple locations or its abject failure to take any reasonable steps to verify the validity of the LOTs it was receiving from UAG. Accordingly, Foodbuy has not established its affirmative defenses "beyond peradventure" and is not entitled to summary judgment on those defenses.

## III.   Foodbuy Tortiously Interfered With DA's And Buyers Edge's Membership Contracts and Business Relationships.

### a.   Massachusetts Law Applies to Counterclaim Plaintiffs' Tortious Interference Claims.

Foodbuy assumes Texas law applies to DA's and Buyers Edge's tortious interference claims. However, where the parties have not agreed to the application of law to a particular issue, "the law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue." *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984); *Mitchell v. Lone Star Ammunition, Inc.*, 913 F.2d 242, 249 (5th Cir. 1990). For tort claims, Texas employs the "most significant relationship" analysis in Section 145 of the Restatement (Second) of Conflict of Laws (1988) (the "Restatement"). *Tigi Linea Corp. v. Professional Products Group, LLC*, 2020 WL 7346721 * 2 (E.D. Tex. 2020). In determining which jurisdiction has the "most significant relationship" to a tort claim, the Court considers: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation, and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex. 1979), quoting Restatement § 145. *See Tissue Transplant Technology, Ltd v. Osteotech, Inc.*, 2005 WL 958407, at *3 (W.D. Tex. Apr. 26, 2005).

The first step in the choice of law analysis is to determine whether a conflict of law exists. *Bailey v. Shell W. E&P, Inc.*, 609 F.3d 710, 722 (5th Cir. 2010). With respect to DA's and Buyer's Edge's tortious interference claims, there is a conflict between Massachusetts and Texas law.

Texas law recognizes two causes of action for tortious interference: "(1) tortious interference with existing contracts, and (2) tortious interference with prospective contractual relations." *Staton Holdings, Inc. v. Russell Athletic, Inc.*, No. 3:09-CV-0419-D, 2009 WL 4016117, at *2 (N.D. Tex. Nov. 20, 2009). Tortious interference with prospective contractual relations may involve "business relations that have not yet been reduced to a contract *or [] a continuing business relationship not amounting to a formal contract*." *Heil-Quaker Corp. v. Mischer Corp.*, 863 S.W.2d 210, 214 (Tex. App. 1993) (emphasis added). In Texas, tortious interference with a continuing or prospective business relationship requires a finding that the defendant engaged in independently tortious or unlawful conduct, while interference with a contract does not. *See El Paso Healthcare Sys., Ltd. v. Murphy,* 518 S.W.3d 412, 421 (Tex. 2017) (continuing business relationship); *Mary Kay, Inc. v. Weber*, 601 F. Supp. 2d 839, 863 (N.D. Tex. 2009) (prospective business relationship); *Stemtech Int'l Inc. v. Drapeau*, No. 1:16-CV-918-RP, 2016 WL 7443181, at *13 (W.D. Tex. Dec. 27, 2016) (existing contract). Massachusetts law draws no such distinction. Instead, Massachusetts law, which recognizes claims for tortious interference with a contract and interference with "advantageous business relations," requires a showing of "improper motive or means" for both causes of action. *Psy-Ed Corp. v. Klein*, 459 Mass. 697, 715 (2011) (interference with contract); *Fafard Real Est. & Dev. Corp. v. Metro-Bos. Broad., Inc.*, 345 F. Supp. 2d 147, 154 (D. Mass. 2004) (advantageous business relations).

Here, Massachusetts has the most significant relationship and Massachusetts law should be applied to DA's and Buyers Edge's tortious interference claim. DA and Buyers Edge both have a principal place of business in Massachusetts and Massachusetts is where the harm occurred. The conduct causing the injury did not occur in any one particular place, nor was the relationship between the parties centered in any one particular place. Foodbuy is based in North Carolina and

BEK is based in Texas. The member contracts and relationships, with which Foodbuy interfered, were between two Massachusetts based entities and thousands of other entities spread across Oklahoma, Louisiana, Kansas, Arkansas, Alabama, Texas, Tennessee, New Mexico, Missouri, Mississippi, Georgia and Florida. Massachusetts, as the place of business of DA and Buyers Edge and the place where all harm was suffered, has the most substantial relation to the tortious interference claims. App. at 0024.

### b. Foodbuy Tortiously Interfered with DA's and Buyers Edge's Contracts and Advantageous Relationships Under Massachusetts Law.

To prevail on a claim of tortious interference with a contract under Massachusetts law, a plaintiff must establish "(1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." *Psy-Ed Corp.*, 459 Mass. at 715–16. "[T]o make out a claim for interference with advantageous business relations, the plaintiff must prove that (1) he had a business relationship for economic benefit with a third party, (2) the defendants knew of the relationship, (3) the defendants interfered with the relationship through improper motive or means, and (4) the plaintiff's loss of advantage resulted directly from the defendants' conduct." *Fafard Real Est. & Dev. Corp.*, 345 F. Supp. 2d at 154, quoting *Kurker v. Hill*, 44 Mass. App. Ct. 184, 191 (1998).

Foodbuy does not assert any arguments for summary judgment of DA's and Buyers Edge's tortious interference claims under Massachusetts law. However, assuming Foodbuy made the same arguments in its motion for summary judgment under Massachusetts law, they would be futile.

### i.   Foodbuy Had Knowledge of DA's and Buyers Edge's Contracts and Advantageous Relationships with DA's Members.

Ignoring an extensive record to the contrary, Foodbuy argues DA and Buyers Edge cannot establish the existence of contracts and advantageous relationships subject to inference. DA's LOPs are membership agreements (contracts) with DA's members, and members are subject to DA's membership terms and conditions posted on DA's website. The LOPs expressly state: "I am an authorized agent, owner or employee of the above business (the "Member") and have the authority to enter into a participation agreement with Dining Alliance on its behalf." See App. at 0171-0175. DA's Membership Terms and Conditions provide: "By completing and signing the related membership letter of participation ("LOP") . . . you are . . . agreeing that the operator shall be subject to DA membership terms and conditions . . ." Doc 112 at App. 213. The documents speak for themselves and are plainly contractual in nature.

Foodbuy's argument ignores the thousands of documented LOPs and mischaracterizes the testimony of DA's general counsel. He did not testified the LOP is not a valid contract. He explicitly called the LOP an agreement made clear the claims were being asserted in the alternative for tortious interference with a contract and an ongoing business relationship.

From the time when Foodbuy served as DA's rebate processor before 2019, Foodbuy possessed copies of DA's LOPs, was acutely aware of their terms, and had a policy of reviewing the LOPs to see whether it could circumvent the termination notice period. To that end, Foodbuy maintained a running database of 2451 specific DA member locations. Foodbuy required UAG to submit LOTs for all of these locations. Foodbuy also required UAG (and, in turn, BEK) to follow a 90-day waiting period. These are precisely the contracts and relationships that form the basis of DA's and Buyers Edge's claims of tortious interference.

Foodbuy was also aware DA processed member rebates through Buyers Edge and that Buyers Edge profited from this arrangement.  Indeed, the arrangement was expressly stated in the Foodbuy Settlement relating to Foodbuy's transmission of purchase data to Buyers Edge.  Doc 112 at App. 4, § (d).  Foodbuy conceded viewing Dining Alliance and Buyers Edge as essentially the same entity.  Further, Foodbuy's argument is irrelevant under Massachusetts law because tortious interference may be based on a contract or an "advantageous business relationship" i.e., a "business relationship for economic benefit with a third party."  *Fafard Real Est. & Dev. Corp.*, 345 F. Supp. 2d at 154.  DA and Buyers Edge have demonstrated they had advantageous relationships with DA's members.

### ii.   Foodbuy Intentionally Interfered with DA's and Buyer Edge's Contracts and Advantageous Relationships by Improper Means.

Under Massachusetts law, DA and Buyers Edge must show that Foodbuy's interference, in addition to being intentional, was improper in motive or means.  *Psy-Ed Corp.*, 459 Mass. at 715.  The improper conduct "may include ulterior motive (e.g., wishing to do injury) or wrongful means (e.g., deceit or economic coercion)," *Cavicchi v. Koski*, 67 Mass. App. Ct. 654, 657–58 (2006).  "Improper means include violation of a statute or common-law precept, e.g., by means of threats, misrepresentation, or defamation."  *Id.*

DA's members, under their LOPs and DA's terms and conditions, had to provide DA with 90 days written notice prior to terminating their enrollment in DA's GPO.  In is undisputed Foodbuy was well aware of DA's 90 day notice of termination requirement.  Despite such knowledge and in willful disregard of its notice obligations under the Foodbuy Settlement, Foodbuy wrongfully invoiced on DA's members' purchase data on behalf of UAG, misrepresenting to UAG and BEK it was entitled to do so and that DA members had properly

terminated their enrollment in DA's GPO, knowing DA had not received notice of termination from the members themselves as required.

As discussed above, Foodbuy could not reasonably rely on statements in UAG's LOPs or directions on the LOTs because Foodbuy dictated UAG's LOT process, did not require members to give notice to DA, and assumed responsibility for sending LOTs to DA.  Foodbuy orchestrated member conversions to UAG based on the date it posted LOTs to the FTP site knowing that DA's LOPs and terms and conditions required 90 days from the day the members sent an LOT to DA. Additionally, Foodbuy's knowing breach of the Foodbuy Settlement for the purpose of diverting member relationships and rebate revenue to itself was a deceptive business practice under Massachusetts law.  *See City of Beverly v. Bass River Golf Management, Inc.*, 92 Mass. App. Ct. 595 (2018) ("[C]onduct in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an unfair act or practice.") (internal quotation omitted). There is more than sufficient evidence to create a disputed fact as to whether Foodbuy intentionally and improperly interfered with DA's and Buyers Edge's membership contracts and business relations.

### c.  In the Event the Court Applies Texas Law, Foodbuy is Still Not Entitled to Summary Judgment.

To state a claim for tortious interference with an existing contract under Texas law, a party must allege: "(1) a valid contract exists; (2) that defendant willfully and intentionally interfered with that contract; (3) the defendant's interference proximately caused plaintiff's injury; and (4) plaintiff suffered actual damage or loss."  *Stemtech Int'l Inc.*, 2016 WL 7443181, at *13.

To state a claim for tortious interference with a prospective business relationship a party must allege: "(1) a reasonable probability that the plaintiff would have entered into a business relationship, (2) an independently tortious or unlawful act by the defendant that prevented the

relationship from occurring, (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or the defendant knew the interference was certain or substantially certain to occur as a result of the conduct, and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference." *Mary Kay, Inc.*, 601 F. Supp. 2d at 863, quoting *Baty v. ProTech Insurance Agency*, 63 S.W.3d 841, 860 (Tex. App. 2001).

As noted above, tortious interference with prospective contractual relations includes a "continuing business relationship not amounting to a formal contract." *Heil-Quaker Corp. v. Mischer Corp.*, 863 S.W.2d at 214. Where the claim is based on interference with continuing business relations, the elements are formulated differently. *Id.* ("The instruction submitted to the jury in this case does not include the element of a reasonable probability the parties would enter into a contract. Instead, the instruction requires only the existence of business relations and interference with those relations.").

### i. Foodbuy Willfully and Intentionally Interfered With the Member Contracts and Relationships.

Foodbuy argues DA and Buyers Edge fail to establish Foodbuy took an active part in persuading a party to breach a contract. However, Under Texas law, tortious interference is not limited to persuading a party to breach a contract. Rather, it "includes any act which retards, makes more difficult, or prevents performance." *Moore v. Bushman*, 559 S.W.3d 645, 651 (Tex. App. 2018). In other words "[a]ny interference that makes performance more burdensome or difficult or of less or no value to the one entitled to performance is actionable." *Kahn v. GBAK Properties, Inc.*, 371 S.W.3d 347, 359–60 (Tex. App. 2012); *Exxon Corp. v. Miesch*, 180 S.W.3d 299, 339 (Tex. App. 2005) aff'd in part, rev'd in part sub nom. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194 (Tex. 2011) ("where the intentional acts of a person serve to frustrate the purpose of another's contract with a third party, thereby causing damage, such acts constitute the

requisite interference."). As discussed above, Foodbuy's conduct directly interfered with and destroyed the value of DA's membership agreements.

The impact of Foodbuy's conduct was entirely foreseeable. Foodbuy knew that: (1) if DA and Buyers Edge lost access to member purchase data it would interrupt and destroy the value of their member relations; (2) if Foodbuy confirmed enrollment in UAG, UAG would receive the data instead; and (3) after Foodbuy billed on the data and UAG began distributing rebate payments to DA members there would be no way for DA to recover or restore the relationship with members. All of this occurred without DA's knowledge under an orchestrated plan to bury LOTs on an FTP site DA no longer use and without DA's members sending LOTs to DA as required by DA's LOPs and membership terms and conditions.

### ii. Foodbuy is Not Entitled to Summary Judgement on the Claims for Tortious Interference with Continuing Business Relationships.

Foodbuy argues that under Texas law, DA and Buyers Edge cannot establish a claim for prospective contractual relations with DA's members. However, the first element of the claim is formulated differently when the business relations are continuing. *See Heil-Quaker Corp.*, 863 S.W.2d at 214 ("The instruction submitted to the jury in this case does not include the element of a reasonable probability the parties would enter into a contract. Instead, the instruction requires only the existence of business relations and interference with those relations."). As to the requirement that the defendant's conduct be independently tortious or wrongful, "independently tortious" means that the conduct would violate some other recognized tort duty. *Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 712 (Tex. 2001). In other words, the defendant's conduct must be "actionable under a recognized tort." *Id.* at 726.

Here, DA and Buyers Edge have established existence of the relationships, Foodbuy's knowledge of the relationship, and independent tortious or unlawful conduct by Foodbuy to

interfere with the relationship, resulting in damages. In regards to independent tortious conduct, Foodbuy made misrepresentations that member terminations were effective when it knew members had not actually terminated their contracts with DA. The evidence also supports the conclusion that Foodbuy was engaged in a concerted effort with UAG and BEK to convert members from DA to UAG with knowledge of the tortious means by which BEK was obtaining LOTs from BEK.

Foodbuy contends there is no evidence DA or Buyers Edge would have continued their business relationship with their members after they signed LOTs. However, there is substantial evidence BEK obtained LOTs through deceit and fraud – specifically, falsely telling DA members they could only receive rebates if they terminated their relationship with DA and UAG and, at times, directly forging LOTs. Foodbuy was placed on notice regarding this behavior in early 2018 and did nothing to investigate it. Had DA received LOTs it could have contacted members and countered BEK's misrepresentations before the conversion to UAG. Foodbuy also admits to applying LOTs from one location to multiple locations. Had Foodbuy had not improperly diverted purchase data for members that never executed an LOT, DA and Buyers Edge would have continued relationships with those members.

## III.   Foodbuy is Not Entitled to Summary Judgment on DA's and Buyers Edge's Unfair Competition Claims.

Foodbuy's sole argument for judgment on DA's and Buyers Edge's unfair competition claims is that they cannot maintain a claim for tortious interference. Because Foodbuy is not entitled to judgment on DA's or Buyers Edge's tortious interference claims, this Court should also deny Foodbuy's request for judgment on DA's and Buyers Edge's claims for unfair competition.

## IV.    The Economic Loss Doctrine Does Not Apply.

Foodbuy's economic loss defense is based on a misreading of Texas law and mischaracterization of DA's claims.  Under Texas law, the economic loss rule 'generally precludes recovery in tort for economic losses resulting from the failure of a party to perform under a contract.'"  *Hernandez v. US Bank, NA*, C.A. No. 3:13-cv-2164-0, 2013 WL 6840022, at \*9 (N.D. Tex. Dec. 27, 2013) (quoting *Lamar Home, Inc. v. Mid Continent Cas. Co.*, 242 S.W.3d 1, 12 (Tex. 2007)).  "Tort damages are recoverable, however, if the defendant's conduct 'would give rise to liability independent of the fact that a contract exists between the parties.'"  *Id.* (quoting *Sw. Bell. Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991)).  *See also Heil Co. v. Polar Corp.*, 191 S.W. 3d 805, 815 (Tex. App. 2006) (noting tort damages recoverable where "plaintiff suffers an injury that is independent and separate from the economic losses recoverable under a breach of contract claim ").

Importantly, the Supreme Court of Texas has held "that tort damages [are] not precluded for a tortious interference with contract claim, notwithstanding the fact that the damages for the tort claim compensated for the same economic losses that were recoverable under a breach of contract claim."  *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998), citing *American Nat'l Petroleum Co. v. Transcontinental Gas Pipe Line Corp.*, 798 S.W.2d 274, 278 (Tex. 1990) ("In a commercial relations tort, the fact that the damages are 'economic' does not mean that they may not be damages for the tort. The basic measure of actual damages for tortious interference with contract is the same as the measure of damages for breach of the contract interfered with, to put the plaintiff in the same economic position he would have been in had the contract interfered with been actually performed.").  *See also Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 418 (Tex. 2011) (listing tort claims for which courts have allowed recovery of economic damages including tortious

interference), quoting William Powers, Jr. & Margaret Niver, Negligence, Breach of Contract, and the "Economic Loss" Rule, 23 TEX. TECH L. REV. 477, 492 (1992) ("the 'economic loss' rule has never been a general rule of *tort* law; it is a rule in *negligence* and strict product liability" . . . "[p]ure economic loss is commonly recoverable in certain torts") (emphasis in original); *CFJ Mfg., L.P. v. Sweetworks, Inc.*, No. 3:04-CV-0070-J-99TEM, 2005 WL 1027283, at \*10 (M.D. Fla. Apr. 14, 2005) (applying Texas law) ("this Court finds that the economic loss rule does not bar Plaintiff's tortious interference with existing contract claim").

Similarly, under Massachusetts law, the economic loss rule does not preclude intentional torts such as tortious interference. *See Canal Elec. Co. v. Westinghouse Elec. Co.*, 973 F.2d 988, 998 (1st Cir. 1992) ("the law restricts liability for this type of negligently-caused economic harm, though, at the same time, it permits recovery . . . where the defendant engages in an intentional tort").

Accordingly, the economic loss rule does not apply to DA's tortious interference claims.[107] Further, DA claims that Foodbuy interfered with its member contracts and relationships encompass a greater scope of conduct then DA's breach of contract claim. Whereas the breach of contract claim arises from Foodbuy's breach of the LOT Provision, it is only one aspect of the tortious interference claims, which also include: (1) Foodbuy's misrepresentations to UAG that the member terminations had been effective and that UAG could begin invoicing on members' purchase data; and (2) Foodbuy's concerted effort with UAG and BEK to convert members from DA to UAG with knowledge of the tortious means by which BEK was obtaining LOTs from DA members.

---

[107] Unlike DA, Buyers Edge does not assert any breach of contract claim against BEK.

In addition, DA's tortious interference and contract claims involve different measures of damages. In connection with its breach of contract claim, DA seeks lost profits under North Carolina contract law. Under Massachusetts tortious interference law, DA is entitled to lost profits *or disgorgement of Foodbuy's profits*. *See O'Brien v. Pearson*, 449 Mass. 377, 388 (2007) (prospective profits); *Jet Spray Cooler, Inc. v. Crampton*, 385 N.E.2d 1349, 1356, 377 Mass. 159, 169 (Mass. 1979) ("The measure of damages . . . requires a defendant to surrender the profits which he realized from his tortious conduct."). Under Texas tortious interference law, DA is entitled to be put in the same position as if the contracts with which Foodbuy interfered had been performed. *American Nat'l Petroleum Co.*, 798 S.W.2d at 278.

## **CONCLUSION**

For the foregoing reasons, Foodbuy's Motion for Summary Judgment should be denied.

Respectfully Submitted,

*/s/ Rachel Ziolkowski Ullrich*
Rachel Ziolkowski Ullrich
Texas Bar No. 24003234
rullrich@fordharrison.com

**FORDHARRISON LLP**
1601 Elm Street, Suite 4450
Dallas, Texas 75201
Telephone: (214) 256-4700
Facsimile: (214) 256-4701

-and-

Joseph P. Crimmins, BBO # 556582
Joseph.crimmins@arentfox.com
Adam L. Littman, BBO # 673407
Adam.littman@arentfox.com

**ARENT FOX LLP**
Prudential Tower
800 Boylston Street
Boston, MA 02199
Telephone: (617) 973-6100
(admitted *pro hac vice*)

**ATTORNEYS FOR**
**DINING ALLIANCE, LLC and**
**BUYERS EDGE PLATFORM, LLC**

## CERTIFICATE OF SERVICE

I, Rachel Ziolkowski Ullrich, Esq., hereby certify that on this 17th day of December 2021, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.

*/s/ Rachel Ziolkowski Ullrich*
Rachel Ziolkowski Ullrich