IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **BEN E. KEITH, CO. d/b/a/** | § | |
| **BEN E. KEITH FOODS,** | § | |
| | § | |
| *Plaintiff/Counterclaim Defendant* | § | |
| | § | |
| v. | § | Civil Action No. 4:20-cv-00133-A |
| | § | |
| **DINING ALLIANCE, LLC,** | § | |
| **BUYERS EDGE PLATFORM, LLC, and** | § | |
| **CONSOLIDATED CONCEPTS, LLC,** | § | |
| | § | |
| *Defendants/Counterclaim Plaintiff/* | § | |
| *Counterclaim Defendant* | § | |
| v. | § | |
| | § | |
| **FOODBUY, LLC,** | § | |
| | § | |
| *Counterclaim Plaintiff/* | § | |
| *Counterclaim Defendant* | § | |

**FOODBUY'S REPLY SUPPORTING ITS
MOTION TO EXCLUDE KIMBERLEY A. TRAIN**

Foodbuy, LLC ("Foodbuy") submits this Reply Brief Supporting Its Motion to Exclude Kimberley A. Train ("Reply"), respectfully showing the Court as follows:

## I. INTRODUCTION

DA's opposition to Foodbuy's Motion to Exclude ("Opposition Brief") attempts to protect Train's ill-conceived, unreliable, and unhelpful opinions by obfuscating two clear-cut arguments that are based on undisputed facts and should be fatal to those opinions. First, Train's damage calculations purporting to show DA's lost profits cannot possibly be reliable when they indisputably include millions of dollars in profits allegedly lost by DA's parent, Buyers Edge Platform, LLC ("Buyers Edge"), whose claims the Court has dismissed. Second, Train's opinions and calculations would not allow a jury to apportion the lost profits allegedly caused by Foodbuy's contractual breaches by separating them from those allegedly caused by BEK's contractual breaches, as the law requires. Accordingly, and for the many other reasons set forth in Foodbuy's Motion to Exclude, Train's lost-profit opinions are unreliable, unhelpful, and ripe for exclusion.

## II. ARGUMENTS AND AUTHORITIES

**A. Train's Calculations Include Millions of Dollars in Alleged Lost Profits That Would Have Belonged to Now-Dismissed Buyers Edge, Which Renders Them Unreliable.**

DA and Train refuse to identify what portion of the alleged lost profits she calculated would have belonged to DA and what portion would have belonged to Buyers Edge because ***the vast majority of them, totaling several million dollars, would have belonged to Buyers Edge***. As DA must know, Train's lost-profits calculations and opinions cannot possibly be reliable if they include millions in profits that would have belonged exclusively to Buyers Edge, to which DA would not be entitled. That explains why, when asked what DA's net operating profits were during his deposition, DA and Buyers Edge's CFO, John Rogers, was instructed not to answer.[1] DA's

---

[1] Doc. 192, Sealed Appx. at 000085 (Depo. of J. Rogers).

Opposition Brief offers the following explanation for obstructing that testimony:

> . . . Foodbuy's complaint it was not allowed to conduct discovery into financial aspects of the internal accounting relationship between Buyers Edge and DA, including questions posed to John Rogers, has no relevance to the validity of Ms. Train's report. What DA and Buyers Edge may have decided to do with the lost profits DA should have received, after receiving them, is irrelevant.[2]

Of course, DA has no prerogative to define what is and what is not relevant "to the validity of Ms. Train's report."[3] DA's brazen and relentless refusal to provide Rogers' testimony or any information concerning its profits during the operative time period leaves Foodbuy with one conclusion: that testimony would devastate DA's ability to recover any lost profits, even if it could prove liability, because DA has not received any significant profits since its corporate reorganization several years ago.

Regardless, DA cannot credibly maintain that the fact that Buyers Edge, not DA, would have received almost all of the alleged lost profits is irrelevant and has no impact on the reliability of Train's calculations and opinions. This is yet another instance where DA blurs or ignores the corporate distinctions within the Buyers Edge/DA conglomerate to serve its interests. Now, DA

---

[2] *See* Doc. 231, Opposition Brief ("Opp.") at 13. Foodbuy moved to compel this testimony from Rogers and followed the procedure set forth in the Court's December 29, 2021 Order requiring the parties to undertake additional efforts to resolve their discovery disputes. In doing so, Foodbuy withdrew its requests for all the discovery sought in its motion to compel except the testimony that DA's counsel instructed Rogers not to provide. Foodbuy specifically requested that it be permitted to re-open Rogers' deposition for no more than two hours of questioning "on the topic of the expenses, revenues, and profits" of DA and Buyers Edge. After a face-to-face meeting between counsel on January 7, 2022, DA refused to allow Rogers to testify concerning its profits during the operative time period. DA then had until January 17, 2022 to supplement Rogers' deposition testimony by written affidavit or declaration, but DA declined to do so. DA's counsel has never provided Foodbuy with a reasonable basis or explanation for DA's obstruction of Rogers' testimony. But rather than burdening the Court with resolving that dispute and obtaining Rogers' deposition right before trial, Foodbuy plans to simply request an *in limine* instruction precluding DA from offering any testimony about DA's alleged lost profits given its refusal to provide financial information concerning the amount of its profits, if any, during the operative time period and its refusal to allow its CFO to testify concerning any such profits.

[3] It appears that DA views its internal accounting practices highly relevant when those practices support its position, but irrelevant when they support Foodbuy's. For example, arguing that DA has profits that flow up to Buyers Edge, DA cites Rogers' testimony for support that DA has profits "[f]rom an internal accounting perspective." Opp. at 6. (citing Doc. 190, Appx. 000051). But when further inquiry into the internal accounting practices is harmful to DA's argument, DA takes the opposite position: that the internal accounting relationship "has no relevance to the validity of Ms. Train's report." *Id.* at 13. DA also forgets that alleged irrelevance is not a proper ground for instructing a witness not to answer deposition questions.

unabashedly claims that it, rather than its dismissed parent, would be entitled to all $8.5 million in lost profits that Train calculated after repeatedly representing and alleging that a significant portion of those profits belonged to that parent.[4] But if Buyers Edge was the only remaining counterclaim plaintiff, it would be claiming those lost profits belonged to it, not DA.

As detailed in Foodbuy's Motion to Exclude, it wasn't long ago when DA and Buyers Edge, in their motion for leave to amend, represented to the Court that "***Buyers Edge's loss of revenue** was discovered in preparing, and timely disclosed in, the expert report of DA and Buyers Edge's damages expert* dated September 3, 2021."[5] The referenced "timely dislos[ure]" can be found in a footnote in Train's report stating that her lost-profit calculations were based on "net revenue" belonging to Buyers Edge, which it began recognizing after its formation.[6] Based on Buyers Edge's allegedly lost revenue, DA and Buyers Edge urged the Court to "include Buyers Edge as a Counterclaim Plaintiff with respect to DA's existing claims" because it, distinct from DA, "was deprived of rebate revenue it otherwise would have realized from DA's members' purchases."[7] That motion for leave also informed the Court, as now alleged in DA's Second Amended Counterclaim, that: (a) after DA's relationship with Foodbuy was terminated, "Buyers Edge began functioning as DA's rebate processor" and, in that capacity, "submitted some DA member rebate claims through a third-party rebate processing

---

[4] *See* Doc. 190, Appx. at 000078 (Depo. of K. Train) (Train stating she has not performed any calculations that would separate lost profits associated with DA from those attributable to Buyers Edge); *id.* at 000077 (Depo. of K. Train) (Train stating "my calculations look at the losses sustained *in totality* by Dining Alliance *and* Buyers Edge for the lost member relationships….").

[5] Doc. 84, at 5 (DA and Buyers Edge's Motion for Leave to Amend Pleadings) (emphasis added).

[6] *See* Doc. 192, SAppx. 000010 (Train Report at n.16). As previously noted, however, Train's Report confusingly defines "Buyers Edge" as the entire Buyers Edge/DA conglomerate, which "is comprised of three-hundred-fifty employees across seventeen companies," when the Buyers Edge entity that actually recognized that revenue and received profits never had any employees. That entity was (and remains) Buyers Edge Platform, LLC, the entity referred to herein as "Buyers Edge." Once again, DA has no regard for company names or distinctions, or corporate formalities.

[7] Doc. 85, at 3 (DA and Buyers Edge's Motion for Leave to Amend Pleadings).

3

network and also billed certain manufacturers directly for rebates pursuant to contracts Buyers Edge held with those manufacturers;" and (b) "Buyers Edge received revenue in exchange for these services."[8] Presumably based on these representations in Buyers Edge's and DA's motion for leave, the Court granted leave to file their Second Amended Counterclaim, the live counterclaim.[9] That Second Amended Counterclaim also alleges:

> ". . . UAG and Foodbuy . . . [took] monies rightfully belonging to DA *and Buyers Edge*."[10]
>
> "Foodbuy's wrongful conduct has deprived *Buyers Edge of revenue it otherwise would have realized* from processing rebate claims on behalf of DA and its members."[11]
>
> ". . . DA and *Buyers Edge* have lost millions of dollars in member purchase volume, rebate revenue, and profits."[12]

As an initial matter, DA and Buyers Edge's representations that Buyers Edge performed rebate-processing services for DA's members and billed manufacturers for those services are inaccurate. Neither DA nor Buyers Edge have ever had contracts with manufacturers and thus never provided any rebate-processing services to DA's members.[13] In fact, as DA and Buyers Edge's CFO, John Rogers, would later testify, Buyers Edge and DA have no employees.[14] Instead, according to Rogers, Buyers Edge Platform *Opco*, LLC ("Opco") employs all the employees within the DA/Buyers Edge conglomerate, including the executives such as Rogers himself.[15] With Opco being the only entity with employees and with manufacturer contracts, it is the only entity among the three that has provided rebate-processing services.

---

[8] *Id.*; *see also* Doc. 90, ¶ 14.
[9] Doc. 88; Doc. 90.
[10] Doc. 90, ¶ 38 (emphasis added).
[11] *Id.* at ¶ 49 (emphasis added).
[12] *Id.* at ¶ 50 (emphasis added).
[13] Doc. 190, Appx. 000055-56 (Depo. of J. Rogers).
[14] *Id.* at Appx. 000045-47 (Depo. of J. Rogers).
[15] *See id.* at Appx. 000047 (Depo. of J. Rogers).

That is why all of the rebate-processing cashflow is paid into Opco's bank account.[16] According to Rogers, DA "doesn't receive any of the cash itself," and "nothing is paid and retained" by DA.[17] Instead, DA's bank account is *always* maintained at a "zero-balance basis."[18] DA's representations that Buyers Edge, rather than Opco, provides rebate-processing services arises from DA's habitual refusal (or inability) to recognize the distinct identities, capacities, and functionalities of the entities within its own conglomeration; the same refusal that has caused so many problems in this case. Indeed, the Second Amended Counterclaim's allegations were purportedly being asserted by the defunct Florida entity named Buyers Edge Platform, LLC rather than the Delaware entity that, as the Court and Foodbuy later learned, was the true Counterclaim Plaintiff.[19]

The above-quoted excerpts represent and allege that Buyers Edge, apart from DA, lost millions in profits, which prompted it to become a Counterclaim Plaintiff so it could recover those alleged lost profits from BEK and Foodbuy. But unlike the false assertions that Buyers Edge, rather than Opco, conducted the rebate-processing operations, the assertions that any profits lost from those operations would have belonged to Buyers Edge are true. Revenue generated from Opco's rebate-processing operations, along with the profit derived from that revenue, was ultimately passed "up to" and belonged to Buyers Edge, as the parent of both Opco and DA. Quoting Rogers' deposition testimony, DA oddly admits this fact: "Profits from DA's operation are passed through to [Buyers Edge], the sole member of DA."[20] It should be noted, however, that DA and Train are, at best, still confused about the fact that the

---

[16] Doc. 192, SAppx. 000087 (Depo. of J. Rogers).
[17] *Id.* at SAppx 000083-84 (Depo. of J. Rogers).
[18] *Id.* at SAppx. 000074 (Depo. of J. Rogers).
[19] Doc. 90, at ¶ 2.
[20] Opp. at 6.

majority of the referenced profits appear to be generated from *Opco's* operations, not DA's. Again, DA has no employees and receives no rebate revenues into its bank account.[21]

Importantly, their CFO, Rogers, admits that Buyers Edge—as the parent of both DA and Opco—received, reported, and distributed all relevant profits from rebate-processing operations within the Buyers Edge/DA organization.[22] Rogers testified that DA make no profit distributions.[23] To recap, Rogers' testimony affirmatively establishes that (1) DA's bank account maintains a balance of $0, and (2) DA does makes no profit distributions to its members.[24] Train fails to opine where DA's profits can be found, although Rogers makes certain that they are not in DA's bank account and are not distributed through profit distributions. This is because Rogers' testimony devastatingly proves that after Buyers Edge was formed a few years ago, it, not DA, received all the profits generated from Opco and DA's operations; and therefore, the recently-dismissed Buyers Edge is the only entity that could have lost those profits and would have been entitled to recover them. That is obviously why DA and Buyers Edge sought leave to add counterclaims for Buyers Edge and subsequently plead counterclaims through which Buyers Edge sought those alleged lost profits.

With Buyers Edge now dismissed, DA hopes to distance itself from the fact that almost all of the allegedly lost profits would have belonged to Buyers Edge, not DA. In trying to do so, it states: "Ms. Train's report is clear she provided an opinion of DA's lost profits only."[25] This artfully crafted statement attempts to avoid an obvious contradiction with DA's previous

---

[21] Doc. 190, Appx. 000046-47 (Depo. of J. Rogers); Doc. 192, SAppx. 000067-68 (Depo. of J. Rogers). While the nature and extent of DA's "operations" is still not entirely clear, it appears that, while it has no employees, certain Buyers Edge Opco's employees perform sales-related services for DA, which appears to be the brand for the group purchasing organization and marketing arm of the Buyers Edge/DA conglomerate that is responsible for finding and signing up new DA members.
[22] Doc. 190, Appx. 000052-53 (Depo. of J.Rogers).
[23] *Id.*
[24] *Id.*; Doc. 192, SAppx. 000074, (Depo. of J. Rogers)
[25] Opp., at 12-13.

representations to the Court that "Buyers Edge's loss of *revenue* was discovered in preparing, and timely disclosed in, the expert report of DA and Buyers Edge's damages expert dated September 3, 2021."[26] It is true that Train's report does not use the term "lost profits" when referring to Buyers Edge.[27] But "profits," of course, are simply a calculation of revenues less expenses. And Train's calculations of the purported lost profits are based on "*revenue recognized by Buyers Edge*."[28] Only Buyers Edge would be entitled to the profits made from its own revenue. In other words, since Train's report calculates "lost profits" based on Buyers Edge's revenue, it necessarily calculates Buyers Edge's lost profits; DA's distinction between "profits" and "revenue" is meaningless.

As Rogers' testimony establishes, DA kept no profits during the majority of the time period covered by the Train Report. It would also be irrational for Buyers Edge to assert counterclaims seeking lost profits if it had no intention of using the Train Report to prove those alleged lost profits, in which case it could not possibly have recovered them because Buyers Edge had retained no other expert and the expert-report deadline had passed. Indeed, DA and Buyers Edge's motion for leave asserted that Train was "Buyers Edge's damages expert."[29]

Finally, Train's deposition testimony, predating Buyers Edge's dismissal, makes clear that she had every intention of using her report to support Buyers Edge's lost-profits claim. DA says she testified that "because DA is a 'disregarded entity subsumed within Buyers Edge,' she viewed them 'substantively as a singular economic entity' when calculating lost profits."[30] It doesn't work that way. Again, the fact that DA and Buyers Edge report their financials in consolidated

---

[26] Doc. 84, at ¶ 5 (emphasis added).
[27] Doc. 192, SAppx 000009 (Train Report).
[28] *Id.* at 000008 n.16 (emphasis added).
[29] Doc. 84, at 5.
[30] Opp., at 13.

statements does not allow DA and Train to ignore corporate formalities and treat DA and Buyers Edge as alter egos when it suits DA's needs. They must sue for damages as separate entities and one cannot recover losses allegedly sustained by the other.

Put simply, Train cannot tell a jury, within a reasonable degree of certainty, that DA suffered more than $8.5 million in lost profits when, according to her own calculations and testimony (along with Rogers' testimony), the vast majority of those profits would have belonged to Buyers Edge. That opinion would be unreliable, misleading, and cannot possibly be permitted. DA complains that Foodbuy has not cited any authority supporting this position. But it should not be surprising that Foodbuy did not find a case where an expert calculated alleged lost profits that would have belonged to a non-party and pretended they would have belonged to the party seeking to recover them; and it is certainly plausible that no expert in a published case has ever tried to do that. Because Foodbuy's position that a party cannot recover damages belonging to a non-party is based on logic and fundamental law, DA should bear the burden of providing authority showing how or why that could ever be permitted.[31]

**B.  Train's Calculation of Lost Profits Allegedly Caused by BEK and Foodbuy's Contractual Breaches Would Be Unhelpful, Confusing, and Could Not Be Apportioned Between BEK and Foodbuy, Which Could Render a Flawed Verdict.**

Even if Train's calculations could somehow include millions in lost profits belonging to Buyers Edge and still be reliable, her postulation of a single damage figure for BEK and Foodbuy's alleged breaches of entirely separate contracts would not help the jury; it would greatly confuse it, and could cause it to render a flawed verdict. Indisputably, if the jury determined that Foodbuy breached its contract with DA, the jury verdict form would then instruct the jury to causally

---

[31] DA also attempts to couch the issues presented here as issues related to DA's standing. Opp. at 14. But again, it appears DA would have standing to recover the small fraction of lost profits that would have been generated during a brief period in 2018, before Buyers Edge was formed. Whether a jury could properly be presented with a damage figure for DA that includes millions of dollars in Buyers Edge's alleged lost profits has no bearing on standing.

connect those breaches to a damage figure. Train's report would give the jury one figure, $8.5 million in lost profits. But again, that figure also includes lost profits allegedly caused by BEK's purported breaches, not to mention BEK, UAG, and Foodbuy's alleged tortious conduct.[32] So, if Train were permitted to present that figure to the jury as the damages for Foodbuy's alleged contractual breaches and the jury were to award that amount, Foodbuy would effectively (and errantly) be held jointly and severally liable for BEK's alleged contractual breaches. Put differently, Foodbuy would improperly be required to pay millions of dollars in damages that DA and Train claim were caused by BEK's contractual breaches.

When attempting to resolve this irresolvable problem, DA first claims it "does not, and did not, seek to hold Foodbuy and BEK jointly and severally liable for their respective breaches of [contract]."[33] That is a strawman. Foodbuy has never contended that DA seeks to hold Foodbuy and BEK jointly and severally liable. Rather, Foodbuy has simply said that Train's failure to separate the breach-of-contract damages allegedly caused by BEK from those allegedly caused by Foodbuy would *effectively* hold Foodbuy jointly and severally liable for BEK's alleged breaches.

DA next suggests that the jury can be given a single damage figure that includes lost profits supposedly caused by BEK and Foodbuy's separate contractual breaches because it will be asked to apportion responsibility, which would separate the damages attributable to Foodbuy's alleged breaches from those attributable to BEK's. This is not true; proportionate responsibility under Chapter 33 of the Texas Civil Practice and Remedies Code does not apply to breach-of-contract actions. *See* TEX. CIV. PRAC. & REM. CODE § 33.002(a)(1)–(2). DA then says the dismissal of its breach-of-contract action against BEK somehow alleviates the problem. But removing DA's

---

[32] Doc. 190, Appx. 000072 (Depo. of K. Train) (stating that the $8.5 million figure was derived from "[a] combination of both a [sic] breach of contract claims [against Foodbuy and BEK] along with the tortious interference claims [against Foodbuy, BEK and UAG]" and that "[her] analysis did not differentiate specific allegations of conduct.").
[33] Opp. at 15.

9

breach-of-contract claim against BEK from the verdict form would not change the fact that Train's damage figure still includes lost profits allegedly caused by BEK's breaches. Indeed, removing the breach question against BEK would make jurors more likely to erroneously assess damages allegedly caused by BEK's breaches against Foodbuy since they could no longer assess them against BEK.

    DA's final attempt to avoid the fatal consequences of Train's commingling of BEK and Foodbuy's breach-of-contract damages claims Train "calculated lost profits for the period in which BEK was obligated to report to DA, April 5, 2019 through December 31, 2019, so that the amount of lost profits resulting from BEK's breach could be separately determined and presented."[34] But nothing in Train's report suggests she attributes the profits allegedly lost during that time period exclusively to BEK's contractual breaches. It is illogical that DA stopped losing any profits attributable to Foodbuy's alleged breach, or the tortious conduct of BEK, UAG and Foodbuy during that nine-month period. Moreover, if Train were to amend her opinion to say that DA's losses during that time period were exclusively attributable to BEK's breaches, the alleged losses during the other time periods between November 2018 and February 2022 would still be attributable to both BEK and Foodbuy's alleged contractual breaches. Finally, DA points to Train's "Group 4" calculation of approximately $200,000 in lost profits that is, indeed, exclusively attributable to BEK's alleged misconduct.[35] But Foodbuy's Motion to Exclude recognized that as a damage amount that was truly attributable to BEK alone, referenced as Train's "secondary opinion" while focusing its motion exclusively on her "primary opinion," which includes the larger $8.5-million damage figure.

---

[34] *Id.*
[35] *Id.*

Dated: January 24, 2022 Respectfully submitted,

By: _____
**WILLIAM S. SNYDER**
Texas Bar No. 00786250
wsnyder@bradley.com
**STACY D. SIMON**
Texas Bar No. 00788413
ssimon@bradley.com
**BRIAN M. GILLETT**
Texas Bar No. 24069785
bgillett@bradley.com
**M. BOYCE HOLLEMAN**
Texas Bar No. 24126727
bholleman@bradley.com

**BRADLEY ARANT BOULT CUMMINGS LLP**
Fountain Place
1445 Ross Avenue, Suite 3600
Dallas, Texas 75202
(214) 257-9800 (Telephone)
(214) 939-8787 (Facsimile)

**C. BAILEY KING, JR.**
North Carolina Bar No. 34043
*Admitted Pro Hac Vice*
cbailey@bradley.com

**BRADLEY ARANT BOULT CUMMINGS LLP**
214 N. Tryon Street, Suite 3700
Charlotte, North Carolina 28202
(704) 338-6000 (Telephone)
(704) 332-8858 (Facsimile)

**ATTORNEYS FOR COUNTERCLAIM DEFENDANT FOODBUY, LLC**

11

**CERTIFICATE OF SERVICE**

On this 24th day of January, 2022, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

_____
William S. Snyder